JAMES M. MCDONALD
United States Attorney for the
Southern District of New York
By: MOLLIE KORNREICH
JESSICA ROSENBAUM
Assistant United States Attorneys
86 Chambers Street, Third Floor
New York, New York 10007
Telephone: (212) 637-3274/2777
Email: mollie.kornreich@usdoj.gov
jessica.rosenbaum@usdoj.gov

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| UNITED STATES OF AMERICA *ex rel.* BAMC LLC,<br><br>Plaintiff,<br><br>v.<br><br>MAR-CAN TRANSPORTATION CO., INC. and B-ALERT, INC.,<br><br>Defendants. | 24 Civ. 7322 (KMK) |
| UNITED STATES OF AMERICA,<br><br>Plaintiff-Intervenor,<br><br>v.<br><br>MAR-CAN TRANSPORTATION COMPANY, INC. and B-ALERT INC.,<br><br>Defendants. | **COMPLAINT-IN-INTERVENTION OF THE UNITED STATES OF AMERICA**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff the United States of America (the "United States" or the "Government"), by its attorney, James M. McDonald, the United States Attorney for the Southern District of New York, files this Complaint-in-Intervention against Mar-Can Transportation Company, Inc. ("Mar-Can") and B-Alert Inc. ("B-Alert," and together with Mar-Can, "Defendants"), alleging as follows:

## PRELIMINARY STATEMENT

1. This is a civil fraud action brought by the United States against Defendants to recover damages and civil penalties under the False Claims Act ("FCA"), 31 U.S.C. §§ 3729 *et seq.*, in connection with Defendants' application for and receipt of Paycheck Protection Program ("PPP") loans for which they were ineligible. The United States also seeks to recover damages under the common law for payment by mistake of fact and unjust enrichment.

2. The PPP was a federal loan program overseen by the Small Business Administration ("SBA") to assist small businesses nationwide adversely impacted by the COVID-19 pandemic. Under the PPP, eligible businesses could obtain SBA-guaranteed loans to spend on payroll costs, rent or mortgage expenses, and other specified business expenses.

3. In early 2021, the SBA permitted qualifying businesses that received an initial PPP loan to apply for a second PPP loan (a "Second-Draw PPP loan"). To obtain a Second-Draw PPP loan, an applicant was required to certify in its application that it, collectively with any affiliates, employed 300 or fewer people.

4. Defendant Mar-Can is a provider of school buses and school bus drivers. Defendant B-Alert provides bus attendants, who monitor student safety and provide support for special needs students, on Mar-Can's school buses. Both companies were owned by the same person, William Cassese, until October 2020, when Mr. Cassese transferred ownership of Mar-Can to his stepson, Darrin Piro, who had been working at Mar-Can for several years. Mr. Cassese retained ownership

of Defendant B-Alert, while Mr. Cassese and Mr. Piro continued to jointly manage the operations of both businesses. Following the transfer of ownership, Defendants also continued to share office space and certain administrative and operational personnel as they had done in the past.

5. On March 17, 2021, B-Alert applied for and received a Second-Draw PPP loan of $1,932,374, and on March 18, 2021, Mar-Can applied for and received a Second-Draw PPP loan of $2,000,000. The full amount of the loans, totaling $3,932,374, along with interest in the combined amount of $39,437.86, was forgiven by SBA less than a year later.

6. As Defendants knew or should have known, they were affiliates under the SBA's rules in effect at the time they applied for these PPP loans because they were jointly managed and because Mr. Piro and Mr. Cassese were close relatives with identical or substantially identical business or economic interests. As affiliates of one another, Defendants knew or should have known that they were ineligible for the Second-Draw PPP loans because their combined number of employees exceeded the maximum number of 300 employees.

7. Nonetheless, Defendants falsely certified in their loan applications that they were eligible to receive the Second-Draw PPP loans on the basis that, together with any affiliates, they employed no more than 300 employees.

8. Defendants therefore violated the FCA by knowingly presenting and making, or causing to be presented and made, false claims and statements to the SBA and the lenders acting on the SBA's behalf. As a result of these false claims and statements, Defendants collectively obtained nearly $4 million in PPP funds from the SBA.

## JURISDICTION AND VENUE

9. This Court has subject matter jurisdiction over the Government's FCA claims pursuant to 31 U.S.C. § 3730(a) and 28 U.S.C §§ 1331, 1345, and over the common law claims

pursuant to 28 U.S.C. § 1345.

10. This Court may exercise personal jurisdiction over Defendants pursuant to 31 U.S.C. § 3732(a), which provides for nationwide service of process.

11. Venue is proper in this District under 31 U.S.C. § 3732(a) and 28 U.S.C. § 1391(b) because Defendants are located in and transact business in this District.

## THE PARTIES

12. Plaintiff is the United States of America and is suing on its own behalf and on behalf of the SBA, which, among other things, administered the PPP.

13. Defendant Mar-Can Transportation Co. is a New York corporation with its principal place of business at 318 East 3rd Street, Mount Vernon, New York 10553. Mar-Can provides school buses and drivers to its clients.

14. Defendant B-Alert, Inc. is a New York corporation that provides bus attendants for Mar-Can buses. Its principal place of business is 318 East 3rd Street, Mount Vernon, New York 10553.

15. Relator BAMC LLC ("Relator") is a Delaware Limited Liability Company. Relator filed a complaint dated September 27, 2024, under the *qui tam* provisions of the FCA alleging, among other things, that Defendants submitted applications for second-draw PPP loans, despite not qualifying for such funding.

## BACKGROUND

### I. The Paycheck Protection Program

16. On March 27, 2020, the Coronavirus Aid, Relief, and Economic Security Act (the "CARES Act") (Pub. L. 116-136) became law and provided emergency assistance for individuals, families, and businesses affected by the coronavirus pandemic. SBA received funding and authority through the CARES Act to modify an existing loan program and establish a temporary

loan program to assist small businesses nationwide adversely impacted by the COVID-19 emergency.

17. The CARES Act authorized fully forgivable loans to eligible small businesses struggling to pay their employees as a result of the devastating effect of the COVID-19 pandemic.

18. Section 1102 of the CARES Act temporarily permitted the SBA to guarantee 100 percent of 7(a) loans under a new program titled the "Paycheck Protection Program."[1]

19. On April 24, 2020, the Paycheck Protection Program and Health Care Enhancement Act (Pub. L. 116-139) became law and provided additional funding and authority for the PPP. On June 5, 2020, the Paycheck Protection Program Flexibility Act of 2020 (Pub. L. 116-142) became law and modified certain provisions of the PPP, including provisions relating to the maturity of PPP loans, the deferral of PPP loan payments, and the forgiveness of PPP loans.

20. Congress delegated authority to approved third-party lenders to underwrite and approve the PPP loans. 15 U.S.C. § 636(a)(36)(F)(ii)(I), (iii). To obtain a PPP loan, a qualifying business (through its authorized representative) was required to sign and submit a PPP loan application online through the lender's application platform.

21. Once the borrower submitted its PPP loan application to a lender, the participating lender processed the PPP loan application. If a PPP loan application was approved by the participating lender, the lender would fund the PPP loan, but the funds were entirely guaranteed by the SBA.

22. On December 27, 2020, Congress authorized another round of PPP loans, referred to as Second-Draw loans, for eligible businesses that had received an initial PPP loan. *See* Pub. L

[1] The 7(a) Loan Program is SBA's primary business loan program for providing financial assistance to small businesses. *See* SBA, 7(a) loans, https://www.sba.gov/funding-programs/loans/7a-loans. The program "provides a loan guarantee to lenders that allow them to provide financial help for small businesses with special requirements." *Id.*

116-260, 134 Stat. 1182, 2001 (2020).

23. As relevant here, to qualify for a Second-Draw PPP loan, among other requirements, a business and its affiliates could collectively have no more than 300 employees. 15 U.S.C. § 636(a)(37)(A)(iv)(I)(aa). Each applicant was therefore required to disclose its number of employees, including affiliate employees, as part of the Second-Draw PPP Loan application. Each applicant was also required to check a "yes" or "no" box identifying if it was "an owner of any other business" or if it had "common management . . . with any other business." If the answer was "yes," the applicant was required to list all such businesses in an addendum.

24. Throughout the relevant time period, SBA provided publicly-available guidance on its website and in regulations regarding eligibility for Second-Draw PPP loans, including what constituted affiliation between companies for purposes of loan eligibility.

25. For example, the SBA published a Frequently Asked Questions ("FAQ") document to its website regarding the PPP loan program. *See* Small Business Administration, FAQ for PPP Borrowers and Lenders, https://www.sba.gov/document/support-faq-ppp-borrowers-lenders (with links to multiple versions of the FAQ dating back to April 6, 2020). Among other questions, the versions of the FAQ document available at the time Defendants applied for their Second-Draw PPP loans in March 2021 addressed eligibility requirements for Second-Draw PPP loan applicants. *See* FAQ for PPP Borrowers and Lenders (March 12, 2021) (the "March 12, 2021, FAQ") at 26. The FAQ document explained that an applicant is generally only eligible for a Second-Draw PPP loan "if it, *together with its affiliates* . . . employs no more than 300 employees." *Id.*

26. The SBA's FAQ document further explained that "borrowers" were "required to apply SBA's affiliation rules under 13 C.F.R. 121.301(f)." *Id.* at 3.

27. At the time Defendants applied for their Second-Draw PPP loans in March 2021,

13 C.F.R. § 121.301(f) (2021) stated that "[c]oncerns and entities are affiliates of each other when one controls or has the power to control the other, or a third party or parties controls or has the power to control both."[2] The regulation enumerated circumstances that were "sufficient to establish affiliation." *Id.*

28. In addition to "[a]ffiliation based on ownership," *id.* § 121.301(f)(1) (2021), as relevant here, Section 121.301(f) also provided for "[a]ffiliation based on management," which it explained "arises where the CEO or President of the applicant concern (or other officers . . . who control the management of the concern) also controls the management of one or more other concerns," *id.* § 121.301(f)(3) (2021).

29. The regulation also included "[a]ffiliation based on identity of interest," which "arises when there is an identity of interest between close relatives, as defined in 13 C.F.R. § 120.10 (2021), with identical or substantially identical business or economic interests (such as where the close relatives operate concerns in the same or similar industry in the same geographic area)," *id.* § 121.301(f)(4) (2021). At the time Defendants applied for their second-draw PPP loans, 13 C.F.R. § 120.10 (2021) defined "Close Relative" as "a spouse; a parent; or a child or sibling, or the spouse of any such person."

30. Other publicly-available SBA guidance for PPP loan applicants summarized these regulatory "tests for affiliation based on control [that] appli[ed] to participants in the Paycheck Protection Program," including affiliation based on management and affiliation based on identity of interest, and explained that "affiliation under any of the[se] circumstances . . . is sufficient to establish affiliation for applicants for the PPP." Affiliation Rules Applicable to U.S. Small

---

[2] The SBA substantially revised the relevant regulation, 13 C.F.R. § 121.301(f), effective May 2023, *see* Affiliation and Lending Criteria for the SBA Business Loan Programs, 88 Fed. Reg. 21074-01 (April 10, 2023)—well after Defendants applied for and were granted forgiveness of the Second-Draw PPP loans at issue in this case.

Business Administration Paycheck Protection Program (April 3, 2020), https://legacy.sba.gov/document/support-affiliation-rules-paycheck-protection-program.

31. SBA also highlighted in its publicly-available FAQ documents that lenders were not "required to make an independent determination regarding applicability of affiliation rules . . . to borrowers." March 12, 2021, FAQ at 3. Rather, it was "the responsibility of the borrower to determine which entities (if any) are its affiliates . . . . Lenders [were] permitted to rely on borrowers' certifications." *Id.*

32. A Second-Draw PPP loan application required the applicant (through its authorized representative) to complete and sign a form to acknowledge compliance with the rules applicable to the PPP program and make certain affirmative certifications pertaining to their eligibility to obtain PPP loans.

33. For example, as relevant here, applicants for Second-Draw loans were required to certify in their applications, among other things, that: "[t]he Applicant is eligible to receive a loan under the rules in effect at the time this application is submitted that have been issued by the Small Business Administration (SBA). . ."; "[t]he Applicant, together with its affiliates (if applicable) . . . employs no more than 300 employees"; and "the information provided in this application and the information provided in all supporting documents and forms is true and accurate in all material respects."

34. After the lender processed and approved a borrower's Second-Draw PPP loan application, the lender submitted to the SBA the "Lender's Application - Paycheck Protection Program Loan Guaranty," applying for a guarantee on the loan. In that application, the lender certified that the borrower had made the required certifications regarding its eligibility. Therefore, if a borrower made misrepresentations on its PPP loan application, the borrower's false

certifications caused the lender to submit a loan guarantee application to the SBA that contained the borrower's false statement.

35. The SBA provided for forgiveness of PPP loans. To receive forgiveness, borrowers were required to submit signed loan forgiveness applications and documents containing the information and certifications in SBA Form 3508, 3508EZ, or a third-party lender equivalent. For example, the PPP loan forgiveness application required that the applicant (through its authorized representative) identify the number of employees at the time of the loan application and the number of employees at the time of the loan forgiveness application. It also required the applicant to certify, among other things, that "[t]he information provided in this application and the information provided in all supporting documents and forms is true and correct in all material respects."

## II. The False Claims Act

36. The FCA establishes treble damages liability to the United States for an entity that "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval," 31 U.S.C. § 3729(a)(1)(A), or "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim," *id.* § 3729(a)(1)(B).

37. "Knowingly" is defined to include actual knowledge, reckless disregard, and deliberate ignorance. *Id.* § 3729(b)(1). No proof of specific intent to defraud is required. *Id.*

38. In addition to treble damages, the FCA also provides for assessment of a civil penalty for each violation or each false claim.

## FACTUAL ALLEGATIONS

39. Defendants' Second-draw PPP loan applications were materially false because Defendants falsely certified that the applications were true, accurate, and in compliance with the rules applicable to the PPP program. Specifically, Defendants falsely certified that they were eligible to receive the Second-Draw PPP loans and that, together with their affiliates, they

employed no more than 300 employees at the time of the Second-Draw PPP loan applications.

40. Had SBA known of Defendants' misrepresentations, it would not have guaranteed or forgiven Defendants Second-Draw PPP loans. Thus, as a result of Defendants' fraud, Defendants obtained millions of dollars in PPP funds to which they were not entitled.

**I. Defendants Were Affiliated Companies Based on Their Common Management and Identity of Interest and Together Had Over 300 Employees**

41. Mar-Can is a company that provides school buses and school bus drivers. For example, Mar-Can contracts with the New York City Department of Education to provide school buses and drivers. Mar-Can subcontracts with B-Alert, which provides bus attendants who monitor student safety and provide support for special needs students on Mar-Can's school buses. Until October 2020, both companies were wholly owned by William Cassese and had been for well over a decade.

42. At the time that they applied for PPP loans, Defendants shared physical office space and certain administrative and operational staff. For example, administrative work for both companies, such as payroll, and certain operational oversight, including ensuring that buses ran as scheduled with attendants on board, were performed by Mar-Can employees. Both companies were jointly managed by Mr. Cassese and Darrin Piro, Mr. Cassese's stepson.

43. Indeed, in their First-Draw PPP loan applications submitted to Capital One, N.A. ("Capital One") in June 2020, Mar-Can and B-Alert each named Mr. Cassese as President and sole owner of both companies, and both were signed by Mr. Piro, as the companies' authorized representative. Both applications identified Mr. Piro as the primary contact and "general manager."

44. On October 19, 2020, Mr. Cassese entered into an agreement to transfer all of the shares of Mar-Can stock to Mr. Piro for $10 in consideration. Day-to-day joint management of the companies did not materially change in the months following this ownership transfer, through the

dates of Defendants' Second-Draw PPP loan applications. Mr. Cassese retained ownership of B-Alert. Defendants continued to share office space and certain administrative and operational staff.

45. At the time Defendants submitted their Second-Draw PPP loan application in March 2021, they had a combined total of over 500 employees, far more than the eligibility limit of 300 employees, including affiliates.

46. In light of the foregoing, Defendants knew or should have known at the time they submitted their Second-Draw PPP loan applications in March 2021, and forgiveness applications thereafter, that they were affiliates.

47. Pursuant to publicly-available information provided on SBA's website and SBA's regulations, 13 C.F.R. § 121.301(f) (2021), Defendants were affiliates based on management given that Mr. Cassese and Mr. Piro jointly controlled management of both Mar-Can and B-Alert. Defendants were also affiliates based on identity of interest given that Mr. Cassese and Mr. Piro were close relatives with identical or substantially identical business or economic interests. Indeed, Defendants not only operated in the same or similar industry in the same geographic area, but they worked together, with B-Alert subcontracting with Mar-Can to provide necessary services while the two companies operated out of the same premises and shared certain employees and agents.

48. Nonetheless, Defendants did not take appropriate steps to review SBA's rules regarding affiliation of companies without common ownership, and failed to review SBA's website, regulations, or otherwise obtain advice from SBA about whether they were affiliates for purposes of SBA's eligibility requirements for Second-Draw PPP loans.

## II. Defendants Obtained Millions of Dollars in Second-Draw PPP Loans by Falsely Representing That They Had No Affiliated Companies

49. Following the transfer of Mar-Can's ownership to Mr. Piro, Mar-Can and B-Alert notified Capital One, the lender for their initial and Second-Draw PPP loans, of the change in

ownership. On March 3, 2021, a Mar-Can employee, at the request of a banker at Capital One and in connection with the process of compiling the Second-Draw PPP loan applications, submitted an "Addendum A" form for each Defendant. The Addendum for Mar-Can disclosed its owner as Mr. Piro. The Addendum for B-Alert stated that "William Cassese is the sole owner (100%) of B-Alert" and that he owned "no other related entities."

50. On March 17, 2021, B-Alert submitted to Capital One an application for a Second-Draw PPP loan in the amount of $1,932,374. Mr. Cassese signed the application, which identified him as the company's owner and general manager. The application stated that B-Alert had 241 employees, including affiliates. In response to the application question, "[i]s the Applicant or any owner of the Applicant an owner of any other business, or have common management . . . with any other business?" the application stated "no." The application included certifications that B-Alert was eligible to receive the loan under the relevant SBA PPP loan rules; that B-Alert employed no more than 300 employees, together with affiliates; and that the information provided in the application was true and accurate in all material respects. Capital One approved the loan and disbursed the funds to B-Alert on March 19, 2021.

51. On March 18, 2021, Mar-Can submitted to Capital One an application for a Second-Draw PPP loan in the amount of $2,000,000. Mr. Piro signed the application as the company's authorized representative, but the application identified Mr. Cassese as President and sole owner of the company. The application stated that Mar-Can had 291 employees, including affiliates. Mar-Can made the same certifications in its Second-Draw PPP application as B-Alert—namely, that it was eligible to receive the loan under the relevant SBA PPP loan rules; that it employed no more than 300 employees, together with affiliates; and that the information provided in the application was true and accurate in all material respects. Capital One approved the loan and disbursed the

funds to Mar-Can on March 24, 2021.

52. On December 9, 2021, Mar-Can applied for forgiveness of its $2 million Second-Draw PPP loan. Mr. Cassese, as Mar-Can's authorized representative, signed the application. The application stated that Mar-Can had 291 employees at the time of the loan application—again improperly excluding affiliate employees—and certified that "[t]he information provided in this application . . . [was] true and correct in all material respects." Capital One granted the application, and SBA paid Capital One the forgiveness amount on January 10, 2022. Accordingly, Mar-Can was not required to repay its Second-Draw PPP loan.

53. On January 25, 2022, B-Alert applied for forgiveness of its $1,932,374 Second-Draw PPP loan. Mr. Cassese, as B-Alert's authorized representative, signed the application. It stated that B-Alert had 241 employees at the time of its second-draw PPP loan application and, like Mar-Can, improperly excluded affiliate employees and certified that the information was "true and correct in all material respects." Capital One granted the application, and SBA paid Capital One the forgiveness amount on February 1, 2022. Accordingly, B-Alert was not required to repay its Second-Draw PPP loan.

54. Each Defendant's Second-Draw PPP loan application misstated the number of its employees by providing only its own employee count, rather than including affiliate employees as Defendants were required to do given their common management and identity of interests. When the employee count was combined, as it should have been given their affiliation, Defendants had over 500 combined employees, far above the 300-employee limit. Defendants therefore were not eligible for the loans. Further, Defendants falsely stated in their Second-Draw PPP loan applications, including addendums, that they were not affiliates, including based on common management, and they certified that they were eligible to receive the Second-Draw PPP loans,

when in fact they were not.

55. Accordingly, Defendants knowingly made misrepresentations and false certifications in their Second-Draw PPP loan applications. These false statements and misrepresentations were material as SBA, through its lenders, relied on the representations and certifications in these applications for purposes of determining loan eligibility and, ultimately, providing loan forgiveness.

## FIRST CLAIM
**Violations of the False Claims Act: Presenting False or Fraudulent Claims (31 U.S.C. § 3729(a)(1)(A))**

56. The Government incorporates by reference each of the preceding paragraphs as if fully set forth herein.

57. Through the acts set forth above, Defendants knowingly presented, or caused to be presented, false or fraudulent claims for payment or approval, in violation of the FCA, 31 U.S.C. § 3729(a)(l)(A). Specifically, Defendants requested, received, and obtained forgiveness for Second-Draw PPP loans by making material misrepresentations in their loan applications with respect to whether they were affiliates under the applicable rules and whether they had, collectively, under 300 employees.

58. Defendants presented or caused to be presented these claims with actual knowledge of their falsity, or in deliberate ignorance or reckless disregard of whether or not they were false.

59. The Government guaranteed Defendants' Second-Draw PPP loans, and ultimately forgave repayment, because of the false or fraudulent claims. If the Government had known that the claims were false or fraudulent, it would not have guaranteed the loans or forgiven repayment.

60. By reason of these false or fraudulent claims, the Government has been damaged in a substantial amount to be determined at trial and is entitled to recover treble damages plus a civil monetary penalty for each false claim.

## SECOND CLAIM
**Violations of the False Claims Act: Use of False Statements (31 U.S.C. § 3729(a)(1)(B))**

61. The Government incorporates by reference each of the preceding paragraphs as if fully set forth herein.

62. Through the acts set forth above, Defendants made and used, or caused to be made and used, false records and statements material to the payment of false or fraudulent claims by the SBA in violation of 31 U.S.C. § 3729(a)(1)(B). These false records and statements included Defendants' misrepresentations in their Second-Draw PPP loan applications and the false certifications in these applications.

63. Defendants made, used, or caused to be made and used, these false records and statements with actual knowledge of their falsity, or in deliberate ignorance or reckless disregard of whether or not they were false.

64. The Government guaranteed Defendants' Second-Draw PPP loans, and ultimately forgave repayment, because of the false or fraudulent claims. If the Government had known that the claims were false or fraudulent, it would not have guaranteed the loans or forgiven repayment.

65. By reason of the false records or statements, the Government has been damaged in a substantial amount to be determined at trial, and is entitled to recover treble damages plus a civil monetary penalty for each violation.

## THIRD CLAIM
**Payment by Mistake of Fact**

66. The Government incorporates by reference each of the preceding paragraphs as if fully set forth herein.

67. The Government seeks relief against Defendants to recover monies paid under mistake of fact.

68. The lenders acting on behalf of the SBA, the SBA, and the United States made payments based on the mistaken and erroneous belief that Defendants' Second-Draw PPP loan applications included accurate information and complied with program rules. These PPP loans were also forgiven based on the mistaken and erroneous belief that the loan applications included accurate information and that the applicants were therefore eligible for the loans. Had the Government known that Defendants were not eligible to receive the Second-Draw PPP loans, it would not have guaranteed the loans or forgiven repayment.

69. By reason of the foregoing, the Government has sustained damages in a substantial amount to be determined at trial.

## FOURTH CLAIM
**Unjust Enrichment**

70. The Government incorporates by reference each of the preceding paragraphs as if fully set forth herein.

71. Through the acts set forth above, Defendants received PPP funds to which they were not entitled and therefore were unjustly enriched. The circumstances are such that, in equity and good conscience, Defendants should not retain those payments, the amount of which is to be determined at trial.

## PRAYER FOR RELIEF

WHEREFORE, the Government respectfully requests that judgment be entered in its favor against Defendants as follows:

(a) On the First and Second Claims (FCA violations), for a sum equal to treble damages and civil penalties to the maximum amount allowed by law;

(b) On the Third and Fourth Claims (Payment by Mistake of Fact and Unjust Enrichment), a sum equal to the damages to the extent allowed by law; and

(c) Granting the Government costs and such further relief as the Court may deem proper.

Dated: New York, New York
August 13, 2026

JAMES M. MCDONALD
United States Attorney for the
Southern District of New York

By: */s/ Mollie Kornreich*
MOLLIE KORNREICH
JESSICA ROSENBAUM
Assistant United States Attorneys
86 Chambers Street, Third Floor
New York, New York 10007
Tel: (212) 637-3274/2777